IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 13-cv-00170-PAB-KLM

ORALABS, INC., a Colorado Corporation,

      Plaintiff

v.

THE KIND GROUP LLC, a New York Limited Liability Company, and
EOS PRODUCTS LLC, a New York Limited Liability Company,

      Defendants.

---

**ORDER**

---

      This matter is before the Court on the Motion in Limine to Exclude Testimony of Dr. Bruce Isaacson [Docket No. 140] filed by plaintiff OraLabs, Inc. ("OraLabs").

## I. BACKGROUND

      The Court recites only those facts that are relevant to the instant motion. Defendants the Kind Group LLC ("Kind Group") and eos Products LLC[1] assert trade dress rights in the eos Smooth Sphere (the "*Smooth Sphere*"), a lip balm container. Docket No. 129 at 5-6, ¶¶ 14-23; *see also* Docket No. 159 at 2.  OraLabs is a manufacturer and distributor of cosmetic products.  Docket No. 1 at 2, ¶ 6.  OraLabs manufactures and sells a product called the Chap-Ice Lip Revolution ("*Lip Revo*").  *Id.* OraLabs filed this case on January 24, 2013, seeking a declaration that the *Lip Revo*

---

[1]Defendant eos Products LLC is a wholly-owned subsidiary of Kind Group. Docket No. 129 at 2, ¶ 4.  For ease of reference, defendants will be collectively referred to as "Kind Group."

does not infringe Kind Group's trade dress.  Docket No. 1 at 3-5, ¶¶ 13-27.  Kind Group asserts counterclaims for trade dress infringement and false designation of origin under the Lanham Act and common law trade dress infringement.  Docket No. 129 at 11-13, ¶¶ 50-64.

On May 28, 2014, Kind Group produced an expert report prepared by Dr. Bruce Isaacson, Docket No. 142-1, which contains the results of a survey that he conducted measuring post-sale consumer confusion between the *Lip Revo* and *Smooth Sphere* lip balm containers.  *See id.* at 2, ¶ 1.  Dr. Isaacson chose to survey females age 13 to 38 who had used lip balm in the preceding month and were likely to purchase lip balm within the following three months.  *Id.* at 10, ¶ 35.  Dr. Isaacson did not ask prospective survey participants whether they were familiar with the *Smooth Sphere*, *see id.*, and survey participants were never shown a sample of the *Smooth Sphere* during the interview.  *Id.* at 8, ¶ 27.  Dr. Isaacson selected the survey universe of females age 13-38 based on data from Facebook showing that people who "like" eos on Facebook are 98% female, with an age distribution that is 87% 13 to 34, as well as pages from eos' website that depict primarily female celebrities using the *Smooth Sphere*.  *Id.* at 10, ¶ 34.  Dr. Isaacson also testified that he relied on information provided to him by Kind Group to identify the appropriate survey universe.  *See* Docket No. 142-2 at 20, 115:8-10.  The survey used the Eveready format, which Dr. Isaacson represents is the preferred method to test confusion against a well-known product.  Docket No. 142-1 at 7, ¶ 26.

Dr. Isaacson's interviewers showed survey participants examples of the *Lip Revo*

without its store packaging.  *Id.* at 8, ¶ 27.  The survey involved showing participants one OraLabs product and one control product.  Docket No. 142-1 at 8, ¶ 27.  The control products were similar in color, size, and product weight to the *Lip Revo* and were filled with OraLabs lip balm, but were cylindrical rather than egg-shaped.  *Id.* at 8-9, ¶ 30; *see also id.* at 36-40.  Both the *Lip Revo* and the control products included OraLabs' mark, "revo," on the bottom of the container, and one of three "house marks" on the top of the container: "Well at Walgreens," "Chap-Ice lip balm revo," or "Rite Aid pharmacy lip balm."  *Id.* at 36-40.[2]  Survey participants were not shown the *Smooth Sphere* during the interview.  *Id.* at 8, ¶ 27.  After participants examined the lip balm, it was placed on a table, with the label facing the participant.  *Id.* at 11, ¶ 40.  Participants were then asked the following questions:

> 1: "Who do you think makes or puts out this item?"  Respondents answered this question in their own words.  Docket No. 142-1 at 11, ¶ 41.
>
> 2: "What makes you think that?"  *Id.*
>
> 3: "Are you aware of any other items or brands made or put out by the company that makes this item?  You may answer yes, no or you don't know."  *Id.* ¶ 42.
>
> 4: (if respondent answers yes to question 3) "What other items or brands do you think are made or put out by the company that makes or puts out this item?"  *Id.* at 11-12, ¶ 42.
>
> 5: (if respondent answers yes to question 3) "What makes you think that?"  *Id.* at 12, ¶ 42.
>
> 6: "Do you think that whoever makes or puts out this item <u>did get</u> approval or permission from another company or brand to put out this product, <u>did not get</u>

---

[2]In other filings in this action, OraLabs has explained that the *Lip Revo*, as it is sold in commerce, is sold under the retailer's private label or "house mark," *see* Docket No. 176 at 5, ¶ 16, and that the three marks on the products that Dr. Isaacson tested are among the "house marks" under which the *Lip Revo* is sold.  *See id.* at 6, ¶ 17.

approval or permission from another company or brand to put out this product, or, you don't know or have no opinion?"  *Id.* at 12, ¶ 43.

7: "What other company do you believe provided approval or permission to put out this product?"  *Id.*

8: "What makes you think that?  *Id.*[3]

Dr. Isaacson completed 493 interviews, 15 of which were not used due to lack of validation or incomplete responses, resulting in a total sample of 478 participants. Docket No. 142-1 at 13, ¶ 46.  In response to question 1, 24.2 percent of survey participants indicated that they believed the OraLabs product was made by eos, compared with 2.3 percent for the control product.  *Id.* at 15, Table A.[4]  Approximately 28 percent of participants responded that they believed that the *Lip Revo* was made by either "OraLabs," "Revo," or "Chap Ice," compared with 30.5 percent for the control product.  *Id.*  46 percent of respondents believed that the company who made the *Lip Revo* got approval from another company or brand to put out the product, compared with 39.9 percent for the control product.  *Id.* at 18, Table D.  Six percent of respondents indicated that they believed that eos was the company that had given

---

[3]It is not clear from Dr. Isaacson's report whether the survey was oral or written. The questionnaire used for the interviews appears to give instructions to Dr. Isaacson's interviewers, which suggests an oral survey.  *See* Docket No. 142-1 at 53-54. Elsewhere in his report, however, Dr. Isaacson refers to interviewees' answers that contain "spellings" that are similar but not identical to "eos."  *Id.* at 4, 14.  Dr. Isaacson's use of the word "spelling," as opposed to "pronunciation," suggests a written survey.

[4]The 24.2 percent and 2.3 percent figures include respondents who provided a name similar to "eos," but did not provide the exact spelling.  *See* Docket No. 142-1 at 15, Table A.  Examples of similar spellings that were accepted include "Ego," "Eco," "Eons," "Eso," "Echo," "Evo," and "Esos."  *Id.* at 14, ¶¶ 50-51.  Dr. Isaacson opined that, because respondents were not shown the *Smooth Sphere*, respondents who mentioned names similar to eos likely had eos in mind.  *Id.* ¶ 51.  21.1 percent of participants identified eos with the correct spelling.  *Id.* at 15, Table A.

permission.  *Id.* at 18, Table E.  Between confusion as to source and confusion as to

permission, Dr. Isaacson's survey found that 32.1 percent of survey participants either

believed that the *Lip Revo* was made by eos or that eos gave permission for its

manufacture, compared with 2.8 percent for the control product.  *Id.* at 19, Table F.[5]  Dr.

Isaacson concluded that his survey indicated a "significant likelihood of confusion

between the eos and OraLabs trade dress."  *Id.* at 22, ¶ 72.

## II.  LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence provides that:

A witness who is qualified as an expert by knowledge, skill, experience,
training, or education may testify in the form of an opinion or otherwise if:
(a) the expert's scientific, technical, or other specialized knowledge will
help the trier of fact to understand the evidence or to determine a fact in
issue; (b) the testimony is based on sufficient facts or data; (c) the
testimony is the product of reliable principles and methods; and (d) the
expert has reliably applied the principles and methods to the facts of the
case.

Fed. R. Evid. 702.  As the rule makes clear, while required, it is not sufficient that an

expert be qualified based upon knowledge, skill, experience, training, or education to

give opinions in a particular subject area.  Rather, the Court must "perform[ ] a two-step

analysis."  *103 Investors I, L.P. v. Square D Co.*, 470 F.3d 985, 990 (10th Cir. 2006).

After determining whether the expert is qualified, the proffered opinions must be

assessed for reliability.  *See id.*; Fed. R. Evid. 702 (requiring that the testimony be

"based on sufficient facts or data," be the "product of reliable principles and methods,"

---

[5]As referred to in note 4 *supra*, these numbers reflect respondents who indicated
either "eos" or a name similar to eos.  The "all measured confusion" figure for
respondents who provided the correct spelling of eos was 27.1 percent, compared with
1.9 percent for the control product.  Docket No. 142-1 at 19, Table F.

and reflect a reliable application of "the principles and methods to the facts of the case").

Rule 702 imposes on the district court a "gatekeeper function to 'ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.'" *United States v. Gabaldon*, 389 F.3d 1090, 1098 (10th Cir. 2004) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993)).  To perform that function, the Court must "assess the reasoning and methodology underlying the expert's opinion, and determine whether it is both scientifically valid and applicable to a particular set of facts." *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1221 (10th Cir. 2003) (citing *Daubert*, 509 U.S. at 592-93).  Where an expert witness relies on experience, the expert "'must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.'" *United States v. Medina-Copete*, 757 F.3d 1092, 1104 (10th Cir. 2014) (quoting Fed. R. Evid. 702, advisory committee notes).  When examining an expert's method, however, the inquiry should not be aimed at the "exhaustive search for cosmic understanding but for the particularized resolution of legal disputes." *Daubert*, 509 U.S. at 597.  It is the specific relationship between an expert's method, the proffered conclusions, and the particular factual circumstances of the dispute that renders testimony both reliable and relevant.

In addition to the witness having appropriate qualifications and methods, the proponent of the witness' opinions must demonstrate the reliability of the process by which the witness derived his or her opinions. *United States v. Crabbe*, 556 F. Supp.

6

2d 1217, 1220 (D. Colo. 2008).  "[T]he trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable."  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).  Ultimately, the test requires that the expert "employ in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Id.*

While the proponent of the challenged testimony has the burden of establishing admissibility, the proffer is tested against the standard of reliability, not correctness, *see Allstate Sweeping, LLC v. City & Cnty. of Denver*, No. 10-cv-00290-WJM-MJW, 2011 WL 2173997, at *3 (D. Colo. June 2, 2011); the proponent need only  prove that "the witness has sufficient expertise to choose and apply a methodology, that the methodology applied was reliable, that sufficient facts and data as required by the methodology were used and that the methodology was otherwise reliably applied."  *Crabbe*, 556 F. Supp. 2d at 1221.

## III.  ANALYSIS

At the outset, the Court notes that OraLabs' motion seeks to exclude Dr. Isaacson's testimony and expert report in their entirety, *see* Docket No. 140 at 1, which suggests that OraLabs failed to review the Court's Practice Standards before filing its motion.  The Court's Practice Standards provide that a motion brought pursuant to Fed. R. Evid. 702 must "identify with specificity each **opinion** the moving party seeks to exclude."  Practice Standards (Civil cases), Judge Philip A. Brimmer § III.G (emphasis in original).  As the court explained in *Crabbe*, "the Rule 702 determination [is] more *opinion-centric* than *expert-centric*."  556 F. Supp. 2d at 1221 (emphasis in original).

7

The initial question is therefore whether OraLabs' motion should be stricken for failure to comply with the Court's Practice Standards.  The purpose of the Practice Standard is to focus the analysis on specific opinions.  Although OraLabs does not identify any opinions with particularity, OraLabs clearly challenges Dr. Isaacson's opinion on the issue of likelihood of confusion on two bases: first, that the universe that Dr. Isaacson selected for his survey is unreliable, and second, that Dr. Isaacson erred in only testing post-sale confusion.  Docket No. 140 at 5, 10.  Thus, the Court will construe OraLabs' motion as challenging the reliability of Dr. Isaacson's survey on these two bases.

### A.  Survey Universe Flaws

OraLabs argues that Dr. Isaacson erred in limiting the universe of his survey to females age 13-38 because he focused on the *Smooth Sphere*'s target market rather than the universe of potential *Lip Revo* customers.  Docket No. 140 at 5; *see also* Docket No. 142-2 at 17, 81:18-21 ("I was told by counsel that the target audience for the [e]os product and presumably the Revo product as well is tweens, teens, and young adults").  OraLabs argues that third-party market data reflects that lip balm purchasers include both males and females age 12-65, *id.* at 6; that Dr. Isaacson improperly relied solely on Kind Group's description of its target market, *id. at* 6-8; and that Dr. Isaacson improperly relied on his own personal opinion regarding likely purchasers of *Smooth Sphere*, which was unsupported by underlying data.  *Id.* at 9-10.  Kind Group responds that Dr. Isaacson's survey reliably reflected the demographics of likely purchasers of the *Lip Revo* because both the *Smooth Sphere* and *Lip Revo* are "egg-shaped, colorful and younger female-oriented" and sold at the same retail chains, Docket No. 159 at 9-

8

10; that the third-party data cited by OraLabs was not a reliable sample, *id.* at 11; and that OraLabs has offered no evidence or argument that supports a demographic difference between the purchasers of the *Smooth Sphere* and the *Lip Revo*.  Docket No. 159 at 9-10.

Parties to trademark infringement actions may use consumer surveys to demonstrate or refute a likelihood of consumer confusion.  *Sally Beauty Co., Inc. v. Beautyco, Inc.*, 304 F.3d 964, 974 (10th Cir. 2002).  However, a survey's evidentiary value depends on the methodology used and the questions presented to respondents. *Universal Money Ctrs., Inc. v. Am. Tel. & Tel. Co.*, 22 F.3d 1527, 1534 n.3 (10th Cir. 1994).  The Court retains the authority to determine what weight, if any, it should afford a consumer survey.  *Johnson & Johnson-Merck Consumer Pharms. Co. v. Rhone-Poulenc Rorer Pharms., Inc.*, 19 F.3d 125, 134 (3d Cir. 1994); *Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 502 F.3d 504, 518-19 (6th Cir. 2007) (upholding the district court's finding that a flawed survey on the issue of actual confusion had little weight and could not serve as dispositive proof of a likelihood of confusion).  Flaws in methodology typically relate only to the weight of the survey evidence.  *Brunswick Corp. v. Spinit Reel Co.*, 832 F.2d 513, 523 (10th Cir. 1987).  However, "when the deficiencies are so substantial as to render the survey's conclusions untrustworthy, a court should exclude the survey." *Hodgdon Powder Co. v. Alliant Techsystems, Inc.*, 512 F. Supp. 2d 1178, 1181 (D. Kan. 2007).

A survey universe is an important factor in assessing the validity of a survey because survey respondents must "adequately represent the opinions which are

relevant to the litigation." *Harolds Stores, Inc. v. Dillard Dep't Stores, Inc.*, 82 F.3d 1533, 1544 (10th Cir. 1996). Consequently, a survey's "appropriate universe should include a fair sampling of those purchasers most likely to partake of the alleged infringer[']s goods or services." *Exxon Corp. v. Texas Motor Exch. of Houston, Inc.*, 628 F.2d 500, 507 (5th Cir. 1980). A court should exclude a survey when "the sample of respondents clearly does not represent the universe it is intended to reflect." *Big Dog Motorcycles, LLC v. Big Dog Holdings, Inc.*, 402 F. Supp. 2d 1312, 1334 (D. Kan. 2005).

Dr. Isaacson testified that he based the demographics of his study on a number of factors, including the "age distribution of people who liked eos on Facebook," Docket No. 161-5 at 12, 81:14-16, representations by Kind Group's counsel that the target audience for the *Smooth Sphere* "and presumably the Revo product as well is tweens, teens, and young adults," *id.* at 81:18-21, and information from the eos website that showed "primarily very young celebrities" using the *Smooth Sphere* "and also showed that the product had been discussed in a number of magazines that target or are read by young women in, again, the teens, tweens, and young adult age groups." *Id.* at 81:22-82:3.

OraLabs argues that the relevant universe is the potential purchasers of the junior user's (*i.e.*, OraLabs') goods, and not those of the senior user (Kind Group). Docket No. 140 at 5. OraLabs is correct that "the proper universe to survey is the potential buyers of the *junior user*'s goods or services." 6 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 32:159 (4th ed. 2011) (emphasis in

original).  As Kind Group notes, however, OraLabs' Chief Executive Officer, Gary Schlatter, testified that OraLabs had not done any demographic market research into the audience for the *Lip Revo*.  Docket No. 159 at 4; *see also* Docket No. 162-9 at 4, 248:19-24.  Moreover, Dr. Isaacson "look[ed] for but . . . wasn't able to obtain . . . any specific information on who Revo's customers were specifically" because OraLabs did not make any available.  Docket No. 161-5 at 4, 29:5-10, 14-19.  Dr. Isaacson also testified that because the two products "have the same use and are sometimes sold at the same retailers[,]" there is "no reason to believe that . . . [the] consumer base would be different from one product versus the other."  *Id.* at 3, 27:14-19.  OraLabs provides neither evidence nor argument to challenge Dr. Isaacson's opinion that the universe of potential buyers of the *Smooth Sphere* and the *Lip Revo* were substantially similar.  The Court finds that Dr. Isaacson's survey sample is not a deficiency that is "so substantial as to render the survey's conclusions untrustworthy[.]"  *Hodgdon Powder Co.*, 512 F. Supp. 2d at 1181.

OraLabs argues that third-party market research conducted by Mediamark Research and Intelligence ("MRI") shows that the *Smooth Sphere* "competes for purchases in each gender and almost every age category."  Docket No. 140 at 6. OraLabs did not attach the MRI research and instead relies on its attorneys' characterization of its conclusions.  *See id.*; *see also* Docket No. 142 at 2, ¶ 5.  In response, Kind Group attaches the MRI data and argues that MRI's conclusions were based on projections from a small sample and that MRI noted, with respect to the eos *Smooth Sphere*, that its data were "relatively unstable, use with caution."  Docket No.

159 at 11; *see also* Docket No. 162-11 at 6.  Kind Group further argues that OraLabs'

rebuttal expert, Philip Johnson, did not rely on the MRI as evidence of demographic

data because of the disclaimer it contained, Docket No. 159 at 9; *see also* Docket No.

162-3 at 8-9, 89:23, 91:5-9, and that Mr. Johnson testified that the only conclusion for

which he relied on the MRI data was that "at least some males and females of all ages"

have purchased the *Smooth Sphere*.  Docket No. 159 at 11; Docket No. 162-3 at 9,

91:22-92:4.  The Court finds that the MRI data does not reveal a serious deficiency in

Dr. Isaacson's survey that justifies the survey's exclusion.

OraLabs next argues that Dr. Isaacson's reliance on the demographics of

Facebook users who "liked" eos' Facebook page is not a reliable mechanism for

selecting a survey universe because "studies have shown that Facebook users are

known to be disproportionately younger females."  Docket No. 140 at 8.  As discussed

above, however, the demographics of eos' Facebook users was not the sole basis for

Dr. Isaacson's opinion.  Any deficiency in looking to eos' Facebook page to determine

the universe of Dr. Isaacson's survey goes to the weight to be applied to the survey and

is not a basis to exclude the survey entirely.

Finally, OraLabs argues that Dr. Isaacson's decision to limit the universe of his

survey to women age 13 to 38 was error because it was based on his personal opinion,

unsupported by underlying data.  Docket No. 140 at 9-10.  The deposition testimony

cited by plaintiff does not support this claim.  Dr. Isaacson's testimony was in reference

to his decision to select a universe for his survey that was specific to the *Smooth*

*Sphere* and *Lip Revo* products rather than to the entire category of lip balm.  *See*

Docket No. 142-2 at 4-5, 32:18-33:24.  As discussed above, Dr. Isaacson testified that

he considered multiple factors in selecting the universe for his survey.  The record does

not support OraLabs' assertion that he selected his survey universe based solely on his

own unsubstantiated opinion and Kind Group's own marketing data.

### B.  Post-Sale Confusion

OraLabs argues that Dr. Isaacson's survey results are irrelevant because they

are based on a survey of consumer confusion in the post-sale (rather than point-of sale)

context.  Docket No. 140 at 10.  Specifically, OraLabs argues that Dr. Isaacson was

required to demonstrate that the parties' respective products are "first encountered in

the marketplace in a post-sale context, without any identifying elements."  Docket No.

140 at 11.  In support, OraLabs cites *Munsingwear, Inc. v. Jockey Int'l, Inc.*, 1994 WL

422280 (D. Minn. Apr. 21, 1994), *aff'd*, 39 F.3d 1184 (8th Cir. 1994), and *Lois*

*Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 631 F. Supp. 735, 747 (S.D.N.Y 1985),

*aff'd*, 799 F.2d 867 (2d Cir. 1986)), for the proposition that post-sale confusion is

unlikely where a mark or trade dress is "not generally visible to the public post-sale."

Docket No. 140 at 11.  OraLabs also argues that the proponent of a post-sale confusion

survey must show that, when the public encounters the trade dress in a post-sale

context, the product cannot have any "identifying elements."  *Id.* at 11 (citing *Insty*Bit,*

*Inc. v. Poly-Tech Indus., Inc.*, 95 F.3d 663, 672 (8th Cir. 1996)).

The Court finds that Dr. Isaacson's decision to conduct a survey of post-sale

confusion is not an error that justifies excluding his opinion.  The Tenth Circuit has held

that "the likelihood of post-sale confusion is relevant to the trade dress infringement

inquiry." *Gen. Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1227 (10th Cir. 2007). Dr. Isaacson justified his decision to test consumer confusion post-sale because it "replicates the real-world scenario where someone sees the lip balm, perhaps taken out from a pocket or a purse, with the top on the lip balm." Docket No. 142-1 at 11, n.10. At his deposition, Dr. Isaacson opined that a post-sale confusion survey was appropriate because the products, by their nature, are not likely to be purchased frequently. Docket No. 142-2 at 10, 55:5-9. Plaintiff introduces no evidence or argument otherwise. Instead, plaintiff argues that Dr. Isaacson's decision to conduct a post-sale survey was not the product of independent research, but rather was based on the instruction of Kind Group's counsel. Docket No. 140 at 12-13. Dr. Isaacson's motivation for choosing to survey confusion in the post-sale context at best goes to the weight to be afforded to his conclusions. At trial, OraLabs will be free to challenge the appropriateness of a post-sale confusion survey.

The cases cited by plaintiff regarding post-sale confusion do not compel a contrary result. *Munsingwear* stands for the proposition that a product that is by its nature concealed from public view in the post-sale context has a low likelihood of post-sale confusion. In *Munsingwear*, the product at issue was horizontal-fly men's underwear. 1994 WL 422280 at *1. In ruling on the parties' cross motions, the court considered whether to use the point of sale or post-sale context in applying the Eighth Circuit's six-factor likelihood of confusion test. 1994 WL 422280 at *3-4. Citing the "inherently concealed nature of worn underwear," the court determined that a point-of-sale analysis was more appropriate because post-sale confusion was unlikely. *Id.* at *4. *Lois Sportswear* stands for the inverse proposition, namely, that courts must consider

the similarity of marks in the post-sale context where the product (in that case, the stitching on the rear pockets of jeans) is "consistently visible to the purchasing public." 631 F. Supp. at 747.  Neither case imposes a threshold evidentiary burden on experts to support their decision of whether to conduct a post-sale or point-of-sale survey with research on how the public comes into contact with the product.

OraLabs also argues that Dr. Isaacson's post-sale survey is irrelevant because he did not demonstrate that the *Lip Revo* lacks any identifying elements.  Docket No. 140 at 11.  OraLabs cites no authority that imposes such a requirement.  The treatise cited by OraLabs provides only that, as a factual matter, post-sale confusion may be precluded where a junior user's product contains an "adequately distinguishing mark which is permanently attached to the junior user's product so that it cannot be removed after sale."  4 Rudolf Callman, Callman on Unfair Competition, Trademarks and Monopolies, § 22:16 (4th ed. 2014).  But whether a mark is "adequately distinguishing" such that it prevents post-sale confusion is the sort of factual question for which consumer surveys are probative.  *Sally Beauty Co.*, 304 F.3d at 974 (reasoning that surveys that provide "evidence of actual confusion in the marketplace may be the best indication of likelihood of confusion").

## IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that plaintiff OraLabs, Inc.'s Motion in Limine to Exclude Testimony of Dr. Bruce Isaacson [Docket No. 140] is **DENIED**.

15

DATED July 28, 2015.

BY THE COURT:

 s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge